102 F.3d 1524
 65 USLW 2423, 96 Cal. Daily Op. Serv. 9273,
96 Daily Journal D.A.R. 15,315
 In re AMERICAN CONTINENTAL CORPORATION/LINCOLN SAVINGS &
LOAN SECURITIES LITIGATION.
LEXECON INC.; Daniel R. Fischel, Plaintiffs-Appellees,
v.
MILBERG WEISS BERSHAD HYNES & LERACH, a partnership;
Patrick Coughlin; William S. Lerach; Kevin P. Roddy;
Leonard B. Simon; Melvyn I. Weiss; Patricia Hynes;
Michael C. Spencer; Stephen R. Steinberg, Defendants-Appellants.
In re AMERICAN CONTINENTAL CORPORATION/LINCOLN SAVINGS &
LOAN SECURITIES LITIGATION.
LEXECON INC.; Daniel R. Fischel, Plaintiffs-Appellants,
v.
MILBERG WEISS BERSHAD HYNES & LERACH, a partnership;
Patrick Coughlin; William S. Lerach; Kevin P. Roddy;
Leonard B. Simon; Melvyn I. Weiss; Patricia Hynes;
Michael C. Spencer; Stephen R. Steinberg, Cotchett, Illston
& Pitre; Joseph Cotchett; Susan Illston, Defendants-Appellees.
In re AMERICAN CONTINENTAL CORPORATION/LINCOLN SAVINGS &
LOAN SECURITIES LITIGATION.
LEXECON INC.; Daniel R. Fischel, Plaintiffs-Appellants,
Cross-Appellees,
v.
MILBERG WEISS BERSHAD HYNES & LERACH, a partnership;
Patrick Coughlin; William S. Lerach; Kevin P. Roddy;
Leonard B. Simon; Melvyn I. Weiss; Patricia Hynes;
Michael C. Spencer; Stephen R. Steinberg,
Defendants-Appellees, Cross-Appellants.
 Nos. 95-15759, 95-16403, 95-16595 and 95-16754.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 13, 1996.
Decided Dec. 20, 1996.
 
 Jerold S. Solovy, Ronald L. Marmer, C. John Koch and Jeffrey T. Shaw, Jenner & Block, Chicago, IL, for defendants-appellants-appellees.
 Gerald Maltz, Miller, Pitt & McAnally, Tucson, AZ, for Joseph Cotchett, Susan Illston and Cotchett Illston & Pitre.
 Mark C. Hansen, Kellogg, Huber, Hansen Todd & Evans, Washington, D.C.; Michele Odorizzi, Mayer, Brown & Platt, Chicago, IL; for plaintiffs-appellees-appellants.
 Appeals from the United States District Court for the District of Arizona, John M. Roll, District Judge, Presiding. D.C. No. CV-93-01087-JMR.
 Before: SNEED, PREGERSON and KOZINSKI, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 Of the many consequences of the failure of Lincoln Savings and Loan and its parent, American Continental Corporation, the litigation that produced these consolidated appeals was just one. At the heart of these appeals is a suit by Lexecon Inc. against a number of the attorneys who represented the consolidated class of investors who lost money in the collapse of Lincoln Savings and its parent. Lexecon is a law and economics consulting firm that frequently serves as a defense expert in securities class actions prosecuted by the law firms that are defendants here. Lexecon had prepared several reports for Lincoln Savings and American Continental, and consequently became a target of the class' claims. In due course these claims were resolved. Thereafter Lexecon and its principal, Professor Daniel R. Fischel of the University of Chicago Law School, brought an action for, inter alia, malicious prosecution and defamation in federal district court for the Northern District of Illinois against several of the class attorneys--Milberg Weiss Bershad Hynes & Lerach and affiliated attorneys ("Milberg Weiss"), and Cotchett Illston & Pitre and affiliated attorneys ("Cotchett").[1] The underlying theory is that Milberg Weiss and Cotchett wrongfully dragged Lexecon into the Lincoln Savings litigation to satisfy a personal vendetta against Lexecon and Fischel. The Judicial Panel on Multidistrict Litigation ("JPML") transferred this case to the District of Arizona and assigned it to Judge John M. Roll.
 
 
 2
 The resolution of Lexecon's claims in Judge Roll's court generally was unfavorable, as were its rulings on Milberg Weiss' counterattacks. These have resulted in four appeals to this court which have been consolidated.
 
 
 3
 In No. 95-16595, Lexecon appeals the adverse judgment on its malicious prosecution and abuse of process claims and the denial of its motion for leave to amend, as well as the denial of its motion to remand the case to Illinois. In No. 95-16403, Lexecon appeals from the final judgment in favor of the Cotchett defendants.
 
 
 4
 Milberg Weiss appeals, in No. 95-15759, the district court's denial of its efforts to obtain injunctive relief against Lexecon's prosecution of its claims, and, in No. 95-16754, the dismissal of its counterclaims against Lexecon.
 
 
 5
 We have jurisdiction under 28 U.S.C. § 1291, and we affirm the judgments of the district court.
 
 I.
 SOURCES OF THIS LITIGATION
 
 6
 Following the collapse of Lincoln Savings, investors residing in many districts of the federal judicial system brought actions charging violations of federal securities laws and RICO. In due course, these cases were transferred to the District of Arizona, consolidated into MDL 834 (sometimes designated as "Shields " or "Lincoln Savings ") and assigned to Judge Richard Bilby.
 
 
 7
 As early as 1990, the consolidated plaintiff class, now represented by (among others) Milberg Weiss and Cotchett, sought to add Lexecon and Fischel as defendants by filing a fifth amended complaint. Judge Bilby denied their motion to do so without prejudice. In February 1991, Judge Bilby granted the class' motion to file a sixth amended complaint, which added only Lexecon as a defendant, and alleged that:
 
 
 8
 during 1987 and 1988 defendant Lexecon was engaged by ACC/Lincoln to perform services, including writing reports advocating the safeness of Lincoln's operations and the value of ACC/Lincoln's assets which were submitted to federal and state regulators in order to persuade them not to take regulatory action adverse to Lincoln.
 
 
 9
 Following a period of discovery, Lexecon's motion for summary judgment was denied. See In re American Continental Corp./Lincoln S & L Sec. Litig., 794 F.Supp. 1424, 1448-49 (D.Ariz.1992). Judge Bilby found there existed material issues as to whether Lexecon's reports were false and misleading, and whether Lexecon possessed reckless scienter as to Lincoln's fraudulent activities. In March 1992, the trial commenced. Almost four months later, and shortly before the close of evidence, Lexecon moved for a directed verdict. Judge Bilby denied the motion, again finding a jury question as to the level of Lexecon's knowledge of, and involvement in, Lincoln Savings' actions and practices.
 
 
 10
 On June 22, 1992, the class attorneys and Lexecon's counsel met in Judge Bilby's chambers to consider a means by which Lexecon's exposure to a jury verdict could be resolved without harmful consequences to its professional credibility and reputation. In furtherance of this end, Lexecon urged that any agreement that might be reached not be designated a "settlement." To accommodate Lexecon's concern, the term "resolution" was adopted. The terms of the resolution provided: First, that the court would enter an order dismissing Lexecon without prejudice; second, that the parties would sign a stipulation dismissing Lexecon with prejudice, which stipulation would be held by Judge Bilby to be entered on the court's record only if a new suit was initiated against Lexecon on the same claims; and, third, that Lexecon would provide class services as a subcontractor to Touche Ross who, as another defendant in MDL 834, had settled its liability for $7.5 million. The resolution also placed restrictions on class counsel's ability to cross-examine Lexecon experts in future lawsuits about Lexecon's involvement in MDL 834.
 
 
 11
 This unusual arrangement was implemented, although because of disagreements between Lexecon and class counsel, Lexecon discharged its obligations by turning over to the class the approximately $700,000 it had received in professional fees from Lincoln Savings and American Continental, rather than performing the class services. This discharge was accomplished in October 1992.
 
 
 12
 Those who then thought that the concerns of Lexecon had been relieved were wrong. On November 25, 1992, Lexecon filed in the Northern District of Illinois (Lexecon's home state) the action now before us on appeal. The complaint set forth claims for malicious prosecution, abuse of process, tortious interference, defamation, and common law and statutory commercial disparagement. In June 1993, the JPML transferred the case to the District of Arizona for consolidation with MDL 834, and assigned it to Judge Roll because Judge Bilby had recused himself.
 
 
 13
 Judge Bilby's recusal obviously resulted in part from his reaction on learning of Lexecon's suit in Illinois. He arranged a telephonic hearing held on December 7, 1992, and therein charged Lexecon with what he viewed as its incorrect portrayal of the resolution of its role as a defendant in MDL 834. Following this hearing and the submission of letter briefs by the parties, Judge Bilby placed an order in the record of MDL 834 in which he found portions of Lexecon's Illinois complaint to be "a false description of the conditions under which Lexecon was dismissed from this case."[2] The key portions of his order disputed Lexecon's characterization of its payment to the Lincoln Savings class as "voluntary," and of the resolution as a termination of the litigation in Lexecon's favor:
 
 
 14
 The Class Plaintiffs/Lexecon resolution was a bargained-for exchange wherein consideration flowed both ways.
 
 
 15
 ...
 
 
 16
 Moreover, under no circumstances was the Class Plaintiffs/Lexecon compromise a resolution in favor of either party or, more importantly, an adjudication on the merits. Instead, it was a bargained-for resolution of a disputed matter from which both parties benefited.
 
 
 17
 Lexecon's attempt to appeal this order to this court failed because there was as yet no final judgment in MDL 834. Lexecon took no appeal from the final judgment subsequently entered in March 1994.
 
 
 18
 Meanwhile, Judge Roll had begun his work on the case. In November 1993 he dismissed Lexecon's malicious prosecution and abuse of process claims. In re American Continental Corp./Lincoln S & L Sec. Litig., 845 F.Supp. 1377, 1383-86 (D.Ariz.1993). All the defendants in this case then answered, and Milberg Weiss filed counterclaims for breach of contract, fraud, unjust enrichment, and promissory estoppel. Discovery proceeded, followed by the defendants' motions for summary judgment.
 
 
 19
 In March 1994, before Judge Roll resolved the summary judgment motions, final judgment was entered in MDL 834. Lexecon thereupon moved under 28 U.S.C. § 1407 for a remand of its case to the Northern District of Illinois. Judge Roll instructed Lexecon to renew this motion after the close of discovery, which Lexecon did in November 1994. In response, Milberg Weiss moved to make the transfer to Arizona permanent under 28 U.S.C. §§ 1404(a) and 1406, and additionally moved for preliminary and permanent injunctions against the pursuit of this action, as well as all other claims made by Lexecon. Judge Roll denied the latter motion, and Milberg Weiss appealed. No. 95-15759.
 
 
 20
 Prior to ruling on the remand and transfer motions, Judge Roll granted summary judgment against Lexecon on its claims of tortious interference, commercial disparagement, and defamation based on the dissemination of Milberg Weiss' sixth amended complaint. In re American Continental/Lincoln S & L Sec. Litig., 884 F.Supp. 1388 (D.Ariz.1995). Lexecon's defamation claim based on a sentence in a letter written by a Milberg Weiss partner, Kevin P. Roddy, to, and which appeared in, The National Law Journal, survived. Judge Roll also dismissed Milberg Weiss' counterclaims. Id. at 1397. Because the Cotchett defendants, who were never Lexecon's principal target in this litigation, had no part in the Roddy letter, Judge Roll entered a final judgment in their favor pursuant to Fed.R.Civ.P. 54(b). Lexecon timely appealed that judgment. No. 95-16403.
 
 
 21
 Thereafter, Judge Roll entered an order denying Lexecon's motion to return the case to the JPML for remand to the Northern District of Illinois, and granting the Milberg Weiss motion to make the transfer to the District of Arizona permanent. Lexecon appealed the remand and transfer decision to this court by means of a petition for writ of mandamus, which was denied without prejudice as to Lexecon's raising the issue on direct appeal.
 
 
 22
 The climactic event in Judge Roll's court occurred on July 25-28, 1995, when Lexecon's defamation claim based on the Roddy letter to The National Law Journal was tried to a jury. The jury verdict favored Milberg Weiss. Lexecon appealed the subsequently entered final judgment, in particular the district court's transfer order and its dismissal of Lexecon's malicious prosecution and abuse of process claims. No. 95-16595. Milberg Weiss cross-appealed the dismissal of its counterclaims. No. 95-16754.
 
 
 23
 The order in which this court will address the issues before us on this appeal is as follows:
 
 
 24
 1. The permanent transfer of Lexecon's case from the Northern District of Illinois to the District of Arizona.
 
 
 25
 2. The denial of Milberg Weiss' motion for preliminary and permanent injunctions against the pursuit by Lexecon of its claims against Milberg Weiss and Cotchett.
 
 
 26
 3. The dismissal of Lexecon's malicious prosecution and abuse of process claims.
 
 
 27
 4. The dismissal of Milberg Weiss' counterclaims.
 
 II.
 
 28
 THE PERMANENT TRANSFER TO THE DISTRICT OF ARIZONA
 
 Nos. 95-16595 and 95-16403
 
 29
 The JPML transferred Lexecon's action to the District of Arizona pursuant to its authority under 28 U.S.C. § 1407(a), which states:
 
 
 30
 When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section.... Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated[.]
 
 
 31
 The decision of the court below to transfer Lexecon's sole surviving claim to itself for trial, and its refusal to refer the case to the JPML for remand to Illinois, are vigorously challenged by Lexecon--and not for the first time.
 
 
 32
 Prior to the trial on the defamation claim, Lexecon brought before this court a petition for a writ of mandamus seeking: (1) to vacate the district court's order permanently transferring the remaining claim to the District of Arizona; and (2) to direct the district court to refer the case to the JPML for remand to the Northern District of Illinois. In an unpublished disposition, this court denied the petition and, while recognizing that Lexecon's arguments based on 28 U.S.C. §§ 1407 and 1404(a) might not lack merit, pointed out that they were contrary to existing case law and Multidistrict Litigation Rule 14(b). We explicitly recognized that the issue could be raised in an appeal on the merits. The dissent vigorously argued that 28 U.S.C. § 1407(a) authorizes the JPML to transfer a case for pretrial proceedings only, precluding a section 1404(a) transfer for a trial on the merits by the transferee court to itself, and that Multidistrict Litigation Rule 14(b) lacks a statutory basis. We now revisit these issues.
 
 
 33
 We review the district court's transfer under 28 U.S.C. § 1404(a) for an abuse of discretion. Lou v. Belzberg, 834 F.2d 730, 734 (9th Cir.1987), cert. denied, 485 U.S. 993, 108 S.Ct. 1302, 99 L.Ed.2d 512 (1988). We review de novo the district court's interpretation of its duties under 28 U.S.C. § 1407. Monrad v. FDIC, 62 F.3d 1169, 1171 (9th Cir.1995).
 
 
 34
 A. Authority for the Section 1404(a) Transfer
 
 
 35
 The power of a section 1407 transferee court to transfer a case to itself for trial has been recognized, explicitly or implicitly, by the courts that have considered the issue.[3] Patricia D. Howard, the Clerk of the JPML, has stated:
 
 
 36
 Although the Panel's power for the most part is limited to transfer for pretrial only, it is not uncommon for a transferee judge assigned by the Panel to transfer to his own or another district under 28 U.S.C. §§ 1404(a) or 1406 the actions which were previously assigned to him or her by the Panel under Section 1407.[4]
 
 
 37
 Permitting the transferee court to transfer a case to itself upon completion of its pretrial work often promotes efficiency in the disposition of the case or cases.[5] The time required for a new judge to become acquainted with the litigation is eliminated, as is the possibility of conflicting or duplicative rulings and proceedings. The above reasons strongly favored trial by the transferee court in this case, where pretrial proceedings left only one claim to be resolved by a trial that was scheduled to begin immediately and conclude in four days.
 
 
 38
 Moreover, the transferee court is empowered to dispose of the cases transferred to it by means of summary judgment or dismissal.[6] Therefore, logic supports its ability to dispose of the case, at least under the circumstances present here, by trial.
 
 
 39
 Despite longstanding practice and the efficiency arguments, Lexecon argues that 28 U.S.C. § 1407(a) requires remand for trial. The provision states in relevant part:
 
 
 40
 Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated (emphasis added).
 
 
 41
 Equally specific is JPML R. 14(b), promulgated under the authority granted the JPML by 28 U.S.C. § 1407(f):
 
 
 42
 Each transferred action that has not been terminated in the transferee district court shall be remanded by the Panel to the transferor district for trial, unless ordered transferred by the transferee judge to the transferee or other district under 28 U.S.C. § 1404(a) or 28 U.S.C. § 1406.
 
 
 43
 This conflict between statute and rule, while apparent, is not real.[7] Congress in enacting section 1407 in 1968 was concerned with the emerging phenomenon of complex, multidistrict litigation. Its focus was upon creating and defining the functions of the JPML, not on redefining or circumscribing the traditional powers of the district court to which a case has been transferred. This is made reasonably clear by the House Report accompanying the proposed statute; that report stated that the bill "affects only the pretrial stages in multidistrict litigation. It would not affect the place of trial in any case or exclude the possibility of transfer under other Federal statutes." H.Rep. No. 1130, 90th Cong., 2d Sess. 3, reprinted in 1968 U.S.C.C.A.N. 1898, 1900. The report continued, id. at 1901-02:
 
 
 44
 The subsection requires that transferred cases be remanded to the originating district at the close of coordinated pretrial proceedings. The bill does not, therefore, include the trial of cases in the consolidated proceedings. The experience of the Coordinating Committee [for Multiple Litigation of the U.S. District Courts, established by the Judicial Conference of the United States] was limited to pretrial matters, and the committee consequently considers it desirable to keep this legislative proposal within the confines of that experience.... Of course, 28 U.S.C. 1404, providing for changes of venue generally, is available in those instances where transfer of a case for all purposes is desirable.
 
 
 45
 Thus, Congress, because of the nation's limited experience with multidistrict litigation, sought to design only the powers and duties of its new creation, the JPML. Despite some uncertainty about this matter initially, the power of the transferee court to transfer a case to itself for trial has been reinforced by its consistent recognition in practice. Recourse to such sustained practice, particularly when approved by the JPML, is a legitimate aid to statutory interpretation. See United States v. American Trucking Ass'n, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940). In the case before us, this reading also strongly promotes judicial efficiency, which was a primary purpose of the legislation that created the JPML. See H.Rep. at 2, 1968 U.S.C.C.A.N. at 1899.
 
 
 46
 B. The Procedures Available to Initiate Remand
 
 
 47
 Additional insight into the apparently mandatory language of 28 U.S.C. § 1407(a) is provided by JPML Rule 14(c). That rule imposes the duty on the JPML to:
 
 
 48
 consider remand of each transferred action ... at or before the conclusion of coordinated or consolidated pretrial proceedings on (i) motion of any party, (ii) suggestion of the transferee district court, or (iii) the Panel's own initiative[.]
 
 
 49
 The absence of any such "motion" by a party, "suggestion" by the transferee court, or "initiative" of the Panel appears to leave the case in the care of the transferee court. Under these circumstances the transferee court must complete the litigation, even if it involves a trial, to avoid the absurdity of indefinitely suspended litigation, the pretrial proceedings of which have come to a close. Therefore, where the transferee court has declined to suggest a remand, the JPML has not ordered a remand on its own initiative, and the litigant has failed to seek a remand before the JPML, the transferee court is entitled to terminate the proceedings by conducting the trial. Besides setting out a procedure by which the JPML's duty to remand is triggered, this rule thus gives effect to the final clause of section 1407(a) by rendering its mandatory clause inoperative where the action has been terminated, even by trial.
 
 
 50
 That is the precise position in which the case rests in this appeal. The JPML's duty to remand was not activated. To repeat, the trigger to such activation was never pulled. Neither the district court nor the JPML sought to remand the case. Moreover, Lexecon, in lieu of moving the JPML for a remand, brought its motion before the district court, and now appeals to us for a remedy. Neither this procedure, nor its earlier petition for a writ of mandamus, amounts to a motion for remand brought before the JPML. Lexecon failed to seek succor from the one source that easily could have granted it if it so chose.[8] The district court, therefore, properly proceeded to conduct a trial on the single remaining defamation claim, following the completion of the pretrial proceedings.
 
 
 51
 C. Propriety of the Section 1404(a) Transfer
 
 
 52
 Besides arguing that the district court's transfer to itself was without authority by virtue of section 1407, Lexecon also argues that it was improper under section 1404(a). Lexecon argues that any incremental gain in efficiency was at its expense, and that it was prejudiced by being dragged from Chicago, Illinois, to Arizona and forced to appear before Judge Roll, who was unfamiliar with MDL 834 and who improperly proceeded to "dismantle" its case. We disagree.
 
 
 53
 Lexecon, to put it gently, was no stranger to the District of Arizona; its participation in MDL 834 precludes any such claim. Moreover, Judge Roll had become quite familiar with the case by the time of his decision to transfer the trial of the defamation claim to his own district. Finally, Judge Roll's dismissal of most of Lexecon's claims is not a ground for showing prejudice.
 
 
 54
 After a careful examination of the record and consideration of the arguments, we find no reason to question the district court's authority to try Lexecon's defamation claim in the District of Arizona, or the fairness of doing so.
 
 III.
 
 55
 THE DENIAL OF INJUNCTIVE RELIEF SOUGHT BY MILBERG WEISS
 
 No. 95-15759
 
 56
 After final judgment was entered in MDL 834 and Lexecon renewed its motion for a suggestion of remand, Milberg Weiss sought injunctive relief on the ground that the final judgment was res judicata as to Lexecon's claims. Milberg Weiss requested:
 
 
 57
 (1) an order preliminarily enjoining plaintiffs ... from prosecuting or otherwise pursuing against the Milberg Defendants, in any other judicial district or forum, any claims or other matters that were raised or could have been raised in the Lincoln Savings action ...; and (2) an order permanently enjoining plaintiffs from prosecuting or otherwise pursuing those claims or other matters in any court or forum.
 
 
 58
 The district court concluded that Lexecon's claims were not precluded, and denied the motion.
 
 
 59
 We must uphold the denial of injunctive relief "unless the court incorrectly applied the law, relied on clearly erroneous factual findings, or otherwise abused its discretion." Contract Serv. Network, Inc. v. Aubry, 62 F.3d 294, 297 (9th Cir.1995). We review de novo issues of law underlying the denial, including the determination that Lexecon's claims were not barred by res judicata. Id. We now affirm.
 
 A. Mootness
 
 60
 Initially, we confront the issue raised by Lexecon of the mootness of this appeal.[9] An appeal is moot "when events occur which prevent the appellate court from granting any effective relief even if the dispute is decided in favor of the appellant." Holloway v. United States, 789 F.2d 1372, 1373 (9th Cir.1986) (internal quotation omitted). To the extent that Milberg Weiss sought to have the district court enjoin the litigation before the district court, which thereafter was completed favorably to Milberg Weiss by the entry of final judgment, its appeal from the court's failure to do so is moot. However, mootness does not extend to the efforts of Milberg Weiss to enjoin Lexecon from prosecuting its claims in other courts.
 
 B. Res Judicata
 
 61
 Milberg Weiss supports its effort to enjoin Lexecon by arguing that the MDL 834 litigation foreclosed Lexecon's claims by reason of res judicata. This considerably overstates the preclusive effect of Judge Bilby's actions.
 
 
 62
 Under the doctrine of res judicata, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427-28, 69 L.Ed.2d 103 (1981). Judge Bilby's action pertaining to Lexecon was to dismiss the claims of the class against Lexecon without prejudice, in accordance with the parties' resolution. We have held that a dismissal without prejudice lacks res judicata effect. In re Corey, 892 F.2d 829, 835 (9th Cir.1989), cert. denied, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990). Nor was Judge Bilby's subsequent order of December 31, 1992 (see supra n. 2), a judgment on the merits of the claims against Lexecon. That order merely clarified the terms of the resolution, indeed emphasized that there had been no judgment on the merits of the claims against Lexecon.
 
 
 63
 Lexecon's reliance on Western Sys., Inc. v. Ulloa, 958 F.2d 864 (9th Cir.1992), cert. denied, 506 U.S. 1050, 113 S.Ct. 970, 122 L.Ed.2d 125 (1993), and Golden v. Pacific Maritime Ass'n, 786 F.2d 1425 (9th Cir.1986), is therefore misplaced. Those cases develop the relitigation exception to the Anti-Injunction Act, which allows a district court to enjoin litigation in other courts if such litigation is barred by res judicata.[10] Because Lexecon's claims are not barred by res judicata, those cases are not controlling.
 
 C. The Requirements for Injunctive Relief
 
 64
 Even if Lexecon's claims were barred by res judicata, Milberg Weiss has still failed to show that the district court abused its discretion in declining to grant injunctive relief. To obtain a preliminary injunction, a party must show either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor." MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 516 (9th Cir.1993) (internal quotation omitted), cert. dismissed, 510 U.S. 1033, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994). At the time the Milberg Weiss motion was filed, no such showing could be made. At that time, February 6, 1995, Milberg Weiss had also moved for a permanent transfer of this case to the Arizona District, and Judge Roll was poised to rule on Lexecon's motion to refer the case to the JPML for remand. His rulings thereafter were generally favorable to Milberg Weiss. Even had these rulings been adverse to Milberg Weiss, it could have appealed them to this court; therefore, it could not show either the possibility of irreparable injury or that the balance of hardships tipped in its favor. See United States v. Rohm & Haas Co., 721 F.Supp. 666, 699 (D.N.J.1989) (refusing to enjoin itself from entering proposed consent decree where appealability of the decree defeated any claim of irreparable harm). Nor was there any indication that Lexecon was likely to initiate an entirely new lawsuit on the same claims in a different forum. In short, Milberg Weiss failed to establish the conditions prerequisite to the issuance of the preliminary and permanent injunctions it sought.[11]
 
 IV.
 
 65
 THE DISMISSAL OF THE MALICIOUS PROSECUTION AND ABUSE OF
 
 PROCESS CLAIMS
 Nos. 95-16595 and 95-16403
 
 66
 We now turn to Lexecon's appeal from the dismissal by the district court under Fed.R.Civ.P. 12(b)(6) of its malicious prosecution and abuse of process claims. Our review of this dismissal is de novo, with all factual allegations taken as true and construed in the light most favorable to Lexecon. See Gotcher v. Wood, 66 F.3d 1097, 1099 (9th Cir.1995), petition for cert. filed, 64 U.S.L.W. 3605 (1996). The district court's denial of Lexecon's motion for leave to amend its complaint is reviewed for an abuse of discretion. United States v. County of San Diego, 53 F.3d 965, 969 n. 6 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 183, 133 L.Ed.2d 121 (1995).
 
 A. Malicious Prosecution
 
 67
 Under Arizona law, which the parties no longer dispute is the applicable law, the plaintiff must allege, and to prevail must ultimately prove, that the defendant "(1) instituted a civil action which was (2) motivated by malice, (3) begun without probable cause, (4) terminated in plaintiff's favor and (5) damaged plaintiff." Bradshaw v. State Farm Mut. Auto. Ins. Co., 157 Ariz. 411, 758 P.2d 1313, 1319 (1988). Under Arizona law, probable cause requires that the plaintiff honestly believe in the lawsuit's possible merits and that the belief be objectively reasonable. Id. (citing Restatement (2d) of Torts § 675 comment c; Prosser & Keeton on the Law of Torts § 120, at 893 (5th ed. 1984)).
 
 
 68
 There is no dispute here that Lexecon has properly alleged the first and last elements of the cause of action. Assuming, for purposes of argument only, that Lexecon has sufficiently alleged lack of probable cause and malice as well, its claim fails nonetheless. Judge Bilby's rulings in MDL 834, including his order of December 31, 1992 (see supra n. 2), plainly indicate that the litigation was not "terminated" in Lexecon's favor.
 
 
 69
 Lexecon attempts to avoid this roadblock to its malicious prosecution claim by insisting that the district court erred in examining the MDL 834 record in ruling on Milberg Weiss' 12(b)(6) motion.[12] In general, material outside the pleadings cannot be considered in ruling on a motion to dismiss, unless the motion is treated as one for summary judgment and the parties are "given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b); Jacobson v. AEG Capital Corp., 50 F.3d 1493, 1496 (9th Cir.1995). Nonetheless, ample authority exists which recognizes that matters of public record, including court records in related or underlying cases which have a direct relation to the matters at issue, may be looked to when ruling on a 12(b)(6) motion to dismiss. See Shaw v. Hahn, 56 F.3d 1128, 1129 n. 1 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 418, 133 L.Ed.2d 336 (1995); Henson v. CSC Credit Serv., 29 F.3d 280, 284 (7th Cir.1994); United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir.1992).
 
 
 70
 It would be absurdly formal to hold that Judge Bilby's published opinion in MDL 834 and his December 31, 1992, order must be ignored in ruling on a motion to dismiss Lexecon's malicious prosecution claim. Only by alleging its own involvement as a defendant in MDL 834 was Lexecon able to frame its claim of malicious prosecution; why should the district court be limited by Lexecon's selective telling of a story that unfolded, and was duly recorded, in its sister court? Milberg Weiss, in its motion to dismiss, was entitled to refer to the record and outcome of the MDL litigation, and the district court was entitled to do the same in assessing the viability of Lexecon's claim. Formalism has its place, but that place is not here.
 
 
 71
 Lexecon argues further that the record in MDL 834 supports its contention that the litigation terminated in its favor. This is not true. "A termination does not satisfy the [favorable termination] element [of a malicious prosecution claim] if it is the result of compromise or settlement of the claim." Frey v. Stoneman, 150 Ariz. 106, 722 P.2d 274, 277 (1986) (en banc). "If entry of summary judgment was merely the formal means of securing the parties' settlement benefits, the judgment cannot form the basis for a malicious prosecution action." Id. 722 P.2d at 278-79 (internal quotation omitted). Here, the avoidance of the use of the term "settlement" in favor of the alternative "resolution" does not alter that result.
 
 
 72
 Lexecon urges us to rely on Bradshaw, 758 P.2d at 1321, which held that a settlement may be a favorable termination depending on the surrounding facts. Lexecon argues that favorable termination is a question of fact that cannot be resolved on a 12(b)(6) motion. We disagree. In Bradshaw, the settlement terms called for the plaintiff to withdraw its action, pay the defendants $60,000, and stipulate to a dismissal with prejudice. Here, it was the defendant Lexecon that paid $700,000 in exchange for its dismissal from MDL 834. No additional factual development is necessary. The circumstances of this case do not indicate that the MDL 834 litigation against Lexecon terminated in its favor. It follows that Lexecon's malicious prosecution claim against both Milberg Weiss and Cotchett fails.
 
 
 73
 It also follows that we need not consider the argument of Milberg Weiss that the tort of malicious prosecution has been reshaped by First Amendment principles developed in the Noerr-Pennington doctrine[13] and Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 54-56, 113 S.Ct. 1920, 1925, 123 L.Ed.2d 611 (1993) ("PREI "). Milberg Weiss argues that these decisions have raised the threshold for access to a malicious prosecution claim by requiring the plaintiff to show that the defendant's earlier suit was "objectively baseless" and one in which "no reasonable litigant could realistically expect success on the merits."[14] This formulation, if applied, would alter the meaning under Arizona law of the "probable cause" element, and to some degree the "malice" element, by eliminating the subjective, honest belief requirement.
 
 
 74
 Noerr-Pennington and PREI were federal antitrust cases that did not address the state law tort of malicious prosecution. In this circuit, the application of this line of cases to state law claims has been unpredictable. For example, the PREI objective baselessness standard was not applied to a National Labor Relations Board decision that a libel suit brought by an employer against a union was an unfair labor practice. PREI was said not to be on point. Diamond Walnut Growers, Inc. v. NLRB, 53 F.3d 1085, 1087-88 (9th Cir.1995). On the other hand, a timber company counterclaim against an environmental organization for abuse of process, based on that organization's efforts to enjoin logging on the timber company's land, was required to meet the heightened pleading standard associated with Noerr-Pennington. Oregon Natural Resources Council v. Mohla, 944 F.2d 531, 533-35 (9th Cir.1991).
 
 
 75
 The rationalizing principle of these cases is unclear, unless it rests on a judicial preference for certain types of litigation that appear to promote specifically recognized public interests. To encourage vigilant pursuit of these interests, it may be thought proper to protect them against threats of malicious prosecution by raising the barrier to access to that remedial tort action. Milberg Weiss argues, in substance if not in form, that the class action on behalf of Lincoln Savings investors easily conforms to that rationalization. Innocent investors in improperly operated savings and loan institutions and their legal representatives are as deserving of protection from the threat of malicious prosecution by those who have rendered financial services to such institutions as are plaintiffs in antitrust or environmental proceedings.
 
 
 76
 While there is a certain appeal in such an approach, we decline to rest our rejection of Lexecon's malicious prosecution on this ground.[15] We hold only that the MDL 834 litigation against Lexecon was not terminated in its favor. Therefore, under Arizona law, Lexecon has failed to state a claim of malicious prosecution.
 
 B. Abuse of Process
 
 77
 Abuse of process is described by the Restatement (Second) of Torts § 682 (1977) as follows:
 
 
 78
 One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process.
 
 
 79
 This definition is accepted by the Arizona courts. See Nienstedt v. Wetzel, 133 Ariz. 348, 651 P.2d 876, 881 (App.1982); Morn v. City of Phoenix, 152 Ariz. 164, 730 P.2d 873, 875 (App.1986). Plaintiff must show that defendants (1) committed a willful act in the use of judicial process (2) for an improper ulterior purpose. Nienstedt, 651 P.2d at 881.
 
 
 80
 The gravamen of the tort is not "the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." Restatement § 682, comment a; see also Morn, 730 P.2d at 875.
 
 
 81
 Accordingly, the task of this court is to determine whether the addition of Lexecon as a defendant in the MDL 834 litigation had as its primary purpose an objective for which that litigation was not intended. We hold that no such objective existed in MDL 834.
 
 
 82
 It is clear that the primary purpose of the MDL 834 litigation was to recover from the collapse of American Continental/Lincoln Savings on behalf of the investors therein such assets as was possible under the law. Lexecon, of course, does not deny that. Rather, its focus is upon its inclusion as a defendant. It asserts that class counsel's primary purpose in attempting to add Lexecon and Fischel as defendants was "(1) to extract false testimony implicating other Shields defendants, (2) to prevent Arthur Young & Co. from using Lexecon as an expert in Shields, and (3) 'to make Lexecon ... far less attractive to potential clients as expert witnesses.' " In re American Continental, 845 F.Supp. at 1382.
 
 
 83
 Lexecon alleges that after Milberg Weiss sought to file a fifth amended complaint adding both Lexecon and Fischel as defendants, it offered to dismiss the motion in exchange for "false testimony" against existing defendants. Lexecon refused, and leave to file this fifth amended complaint was subsequently denied. The alleged attempt to extract false testimony therefore never amounted to anything. Although process did later issue against Lexecon only as a result of defendants' successful motion to file their sixth amended complaint, the attempt to coerce false testimony was not repeated. Therefore, Lexecon cannot show that the primary purpose behind Milberg Weiss' use of process was to coerce false testimony.
 
 
 84
 Lexecon also points to additional acts of Milberg Weiss that it claims amounted to an abuse of process. Some of these acts, such as the unsuccessful motion to file the fifth amended complaint, occurred "pre-process," and were therefore not actionable.[16] Others were collateral to the MDL 834 litigation, such as Milberg Weiss attorneys' use of that litigation to impeach Lexecon expert witnesses during cross-examination in separate and distinct litigation. Such cross-examination, so long as it conformed to the terms of the MDL 834 resolution, was not improper and therefore cannot form the basis of an abuse of process claim.
 
 
 85
 The acts alleged by Lexecon did not have as their primary purpose to inflict harm on Lexecon or Fischel. Nor did the addition of Lexecon as an MDL 834 defendant to assert that Lexecon bore some responsibility for those investors' losses constitute an abuse of process. Lexecon's abuse of process claim was therefore properly dismissed.[17]
 
 V.
 
 86
 THE DISMISSAL OF MILBERG WEISS' COUNTERCLAIMS
 
 No. 95-16754
 
 87
 The Milberg Weiss counterclaims alleged fraud, breach of contract, unjust enrichment, and promissory estoppel. The alleged source of these claims is the negotiations that led to the resolution of Lexecon's exposure to liability in MDL 834. We review their dismissal de novo. Gotcher, 66 F.3d at 1099; Barrus v. Sylvania, 55 F.3d 468, 469 (9th Cir.1995).
 
 
 88
 First, Milberg Weiss alleged that while Lexecon said it was negotiating the "resolution" to avoid damaging cross-examination about MDL 834 in future cases, its true reason was to preserve its ability to sue class counsel for malicious prosecution by avoiding an unfavorable jury verdict. The district court properly dismissed this claim. While Milberg Weiss is a party in the litigation now before this court, it was not a party in the MDL 834 litigation; rather, it was a counsel to the class on whose behalf the proceedings against Lexecon were brought. As the district court put it: "Whatever harm resulting from the resolution was sustained by the class, not by class counsel." In re American Continental, 884 F.Supp. at 1397.
 
 
 89
 Second, Milberg Weiss argues that during the negotiations, Lexecon represented that it had no applicable insurance when in fact it did have such insurance, and that it relied on that representation in agreeing to the resolution. The district court properly ignored this claim because Milberg Weiss failed either to raise the issue in its pleadings, or to request leave to amend. See Fed.R.Civ.P. 15(a).
 
 VI.
 CONCLUSION
 
 90
 The judgments in Nos. 95-15759, 95-16403, 95-16595, and 95-16754 are affirmed.
 
 
 91
 KOZINSKI, Circuit Judge, dissenting.
 
 
 92
 Since the Judicial Panel on Multidistrict Litigation (JPML) was created in 1968, it has transferred 92,562 cases for consolidated pretrial proceedings. Only 3,508 of these--less than four percent--have been sent back for trial in the district where the complaint was filed. Administrative Office of the United States Courts, Judicial Business of the United States Courts: 1995 Report of the Director 32. Yet the statute which authorizes the JPML to transfer cases for coordinated or consolidated pretrial proceedings commands that "[e]ach action so transferred shall be remanded by the [JPML] at or before the conclusion of such pretrial proceedings to the district from which it was transferred...." 28 U.S.C. § 1407(a). These numbers tell the story of a remarkable power grab by federal judges who have parlayed a narrow grant of authority to conduct consolidated discovery into a mechanism for systematically denying plaintiffs the right to trial in their forum of choice.
 
 
 93
 You don't have to stare very long at the statutory language and drafting history to realize this is not at all what Congress had in mind when it passed 28 U.S.C. § 1407. The language itself is clear as sunlight: A case may be transferred in order to take advantage of consolidated or coordinated discovery with other cases having a common factual nucleus. Coordinated or consolidated pretrial proceedings are to be handled by the transferee court but, if the case is to be tried, it must go back from whence it came.
 
 
 94
 The legislative history--if such limpid prose needs elucidation--is perfectly consistent with the text. Congress made a deliberate choice to authorize transfer for pretrial purposes only: "[T]he bill provides for the transfer of venue of an action for the limited purpose of conducting coordinated pretrial proceedings." H.Rep. No. 1130, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 1898, 1900. Congress thought about authorizing the JPML to transfer cases for all purposes but decided not to: "The bill does not, therefore, include the trial of cases in the consolidated proceedings." Id. at 1901. Congress promised to return to the issue if it found the current grant of authority insufficient: "If ... future experience justifies extending [section 1407] to include consolidation and coordination for trial purposes as well, only minor amendments to the present language of the bill will be necessary." Id. at 1902. Congress has never made those amendments.
 
 
 95
 Soon after the MDL process got underway, a peculiar thing started happening: Judges began to develop proprietary feelings toward the cases entrusted to them; they began using 28 U.S.C. § 1404(a), the venue transfer statute, to hold on to these cases for trial. Some judges worried that such transfers were not authorized: "I must recognize candidly," wrote Judge Bownes, then of the District of New Hampshire, "that there is nothing in the language of 28 U.S.C. § 1407(a) or 1404(a) which directly allows, or even suggests, that the transferee judge has the power to transfer cases to his district, or any district, for purposes of trial." In re Air Crash Disaster Near Hanover, New Hampshire, 342 F.Supp. 907, 909 (D.N.H.1971). Such scruples were cast aside after the Second Circuit's opinion in Pfizer, Inc. v. Lord, 447 F.2d 122, 124-25 (2d Cir.1971), a case that proved unusually influential, perhaps because retired Associate Justice Tom Clark was a member of the two-judge panel that authored the opinion.
 
 
 96
 Since Pfizer, this practice (known as "self-transfer") has become a routine aspect of the MDL process. The JPML has blessed self-transfer by its Rule 14(b), which provides that the Panel will not send a case back for trial if the district court handling pretrial matters transfers the case to itself, and by caselaw holding that the JPML will not even consider remanding so long as the district court is considering a self-transfer motion. See In re CBS Color Tube Patent Litig., 342 F.Supp. 1403, 1405 (J.P.M.L.1972) ("In view of the pendency of [a § 1404(a) ] motion, we expressly refrain from granting this motion for remand and interfering in matters within the discretion of the transferee judge.").[1]
 
 
 97
 The majority thus has ample company in holding that a district judge to whom a case has been sent for pretrial under section 1407(a) may latch onto it by ordering a section 1404(a) self-transfer. See maj. op. at 1532. Every court that has examined the issue since Pfizer has held or assumed that such authority exists.[2] But a close look at this caselaw reveals a remarkable lack of critical attention to this issue, with almost every court relying on Pfizer as the sum and substance of its analysis.[3] In fact, Pfizer, with its one page of analysis, is the only court of appeals opinion that seriously addresses the issue; most merely refer to the practice on the way to tackling other questions.[4] A lot of cases thus seem to sanction the practice, but not a single case after Pfizer has taken an independent look at the issue or dealt with the difficult questions it raises.
 
 
 98
 While the federal courts have treated Pfizer as dispositive, commentators have been far more skeptical. With remarkable unanimity, they have questioned whether, and under what circumstances, district judges to whom cases are entrusted for purposes of discovery may hold on to them for trial. See, e.g., 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3866, at 619 (2d ed. 1986) ("More questionable is the practice of the Section 1407 judge transferring the cases to himself for all purposes under Section 1404(a) of Title 28 ... thereby giving the transferee court the ability to conduct the trial."); Robert H. Trangsrud, Joinder Alternatives in Mass Tort Litigation, 70 Cornell L.Rev. 779, 809 (1985) ("[I]t seems clear that the lower federal courts have done by judicial fiat what Congress refused to do by statute in 1969: amend section 1407 to allow transfers for trial."); Ross D. Cooper, The Korean Air Disaster: Choice of Law in Federal Multidistrict Litigation, 57 Geo.Wash.L.Rev. 1145, 1164 (1989) (similar); Mike Roberts, Multidistrict Litigation and the Judicial Panel, Transfer and Tag-Along Orders Prior to a Determination of Remand: Procedural and Substantive Problem or Effective Judicial Public Policy?, 23 Mem.St.U.L.Rev. 841, 866 (1993) ("It is a leap in logic to conclude that causes of action not terminated upon dispositive motions should be retained in the transferee court under the rubric of § 1404(a), when the statutory language of § 1407 explicitly directs remand to the transferor court."); Report of the America Bar Association Section of Antitrust Law Task Force to Review the Supreme Court's Decision in California v. ARC American Corp., 59 Antitrust L.J. 273, 302 (1990) ("[T]he use of Section 1404(a) transfers to consolidate multidistrict cases for trial is of dubious legal validity."); Blake M. Rhodes, Comment, The Judicial Panel on Multidistrict Litigation: Time for Rethinking, 140 U.Penn.L.Rev. 711, 734 (1991) ("[A] transferee court's use of § 1404(a) sets Congress's carefully crafted plan for multidistrict litigation on its head."); Stanley J. Levy, Complex Multidistrict Litigation and the Federal Courts, 40 Fordham L.Rev. 41, 64 (1971) (the language and legislative history of section 1407(a) are so clear that it "originally appeared to be a futile exercise for a 1407 transferee court to rule on a 1404 transfer motion."); John F. Cooney, Comment, The Experience of Transferee Courts Under the Multidistrict Litigation Act, 39 U.Chi.L.Rev. 588, 606 (1972) ("[T]he apparently mandatory nature of the remand clause ... implies that transferee courts lack this jurisdiction [to grant a section 1404 motion]."); George T. Conway III, Note, The Consolidation of Multistate Litigation in State Courts, 96 Yale L.J. 1099, 1102-03 (1987) ("[C]onsolidation for trial almost certainly defies both the letter of section 1407 and the intent of its drafters." (footnotes omitted)); Note, The Judicial Panel and the Conduct of Multidistrict Litigation, 87 Harv.L.Rev. 1001, 1030-31 (1974) (legislative history of section 1407 emphasizes it would be used only for pretrial proceedings).
 
 
 99
 Research discloses not a single commentator who has examined the question and found statutory support for the position taken by the federal courts. Seldom have courts and commentators diverged so widely in their treatment of a legal issue.
 
 
 100
 Self-transfer under section 1404(a), in fact, raises three tough legal questions. The first is whether a district judge to whom a case is transferred for "coordinated or consolidated pretrial proceedings" under section 1407 is authorized to pass on a section 1404(a) change of venue motion. The answer is not self-evident. A venue transfer motion is, to be sure, a pretrial motion and therefore arguably within the authority of the transferee court conducting "coordinated or consolidated pretrial proceedings." But there must be some pretrial motions MDL courts are not authorized to rule upon because section 1407(a) does not transfer the case for the conduct of all pretrial proceedings, only those that are "coordinated or consolidated." The statutory language seems to limit the MDL court's authority to motions that implicate more than a single case--something that venue transfer motions, which call for an "individualized, case-by-case consideration of convenience," do not. Van Dusen v. Barrack, 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964); see also Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S.Ct. 2239, 2243-44, 101 L.Ed.2d 22 (1988) ("A motion to transfer under § 1404(a) ... calls on the district court to weigh in the balance a number of case-specific factors....").[5]
 
 
 101
 The legislative history bears out this interpretation; Congress apparently understood the term "pretrial proceedings" to "generally involve deposition and discovery." H.Rep. No. 1130, in 1968 U.S.C.C.A.N. at 1900. A venue transfer motion is not a discovery motion. In fact, a proper application of section 1404(a) often depends on information obtained through discovery, so venue transfer motions are seldom considered before discovery closes. See, e.g., In re Equity Funding Corp. of America Sec. Litig., 416 F.Supp. 161, 178-79 (C.D.Cal.1976); Stanley A. Weigel, The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts, 78 F.R.D. 575, 582 (1978); David F. Herr, Multidistrict Litigation: Handling Cases Before the Judicial Panel on Multidistrict Litigation 80 (1986); Robert J. Ward, Multidistrict Litigation Procedures in the United States, in The Trial Lawyer's Guide, at 249, 256 (John J. Kennelly ed. 1982) (all noting that transferee courts regularly postpone decisions on section 1404(a) motions until discovery is completed).[6] There is, therefore, a plausible case for holding that venue transfer motions are not among the powers of an MDL court.
 
 
 102
 And there is an excellent practical reason for so interpreting section 1407(a): If the MDL court grants a venue transfer motion, it cuts off the JPML's ability to comply with its statutory directive that it "shall" remand the case "to the district from which it was transferred." As one commentator noted, therefore, a change of venue motion "is of an entirely different nature than the powers" Congress intended to give MDL transferee courts. Trangsrud, 70 Cornell L.Rev. at 807.
 
 
 103
 It is true that an MDL court can dispose of the case by settlement or motion and thus prevent the JPML from remanding it.[7] But that is a possibility expressly accounted for in section 1407(a), which releases the JPML from its obligation to transfer the case back to its originating district if "it shall have been previously terminated." 28 U.S.C. § 1407(a). Had Congress also meant to release the JPML from its obligation in cases where venue is changed pursuant to section 1404(a), it could have said so. In fact, Congress said quite the opposite, at least in the legislative history of section 1407(a), where it repeatedly noted that the new statute "would not affect the place of trial in any case," H.Rep. No. 1130, in 1968 U.S.C.C.A.N. at 1900, and that "trial in the originating district is generally preferable from the standpoint of the parties and witnesses." Id. at 1901; see Roberts, 23 Mem.St.U.L.Rev. at 868 ("Clearly, the exact legislative history specifies that Congress never intended § 1407 by itself or ... [through] tandem use with § 1404(a) ... to alter the venue of ultimate trial.").[8]
 
 
 104
 It makes perfect sense for Congress to permit the transferee court to handle most pretrial legal issues--including some dispositive motions--and still insist that trial (if there be one) be conducted in the district where the complaint was filed. Trial is a unique part of the litigation process in that it involves fact-finding, usually by a jury. Congress may have felt that federal judges are fungible for purposes of resolving legal questions, but that jurors--who reflect the sense of the community in adjudicating the rights and liabilities of their neighbors--are not. Congress also may have been willing to deny plaintiffs control over the pretrial forum, but thought it unfair to deny them control over the place of trial because jurors in the transferee district may have "background[s] ... so different from that of jurors in [the transferror district] as to deprive plaintiffs of their constitutionally guaranteed right to a trial by a jury of their peers." In re Air Crash Disaster Near Hanover, New Hampshire, 342 F.Supp. at 910.
 
 
 105
 Even assuming MDL transferee courts have authority to pass on ordinary venue motions, there is a second major question: May a court ever grant a motion to transfer venue to itself? Again, it helps to read the applicable statute, which in plain and simple terms provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (emphasis added). I don't see how this language can be read to authorize a district court to transfer a case to itself. See Rhodes, 140 U.Penn.L.Rev. at 740 ("A transferee court using § 1404(a) is not transferring a case to another district. It is simply proclaiming trial jurisdiction over the case." (emphasis in original)). Indeed, the drafters of section 1404(a) could not possibly have meant to authorize self-transfers because that section long predates section 1407; the possibility that a district court would be in a position to transfer a case to itself was not something anyone at the time could have anticipated.[9] Thus, this is not a case where the statutory language imperfectly reflects the intention of the drafters. The language of section 1404(a) precisely matches the understanding of the Congress that enacted it.
 
 
 106
 Are the federal courts nevertheless justified in tweaking section 1404(a) to make it yield up an authorization for self-transfer in the MDL context? Even under the best circumstances such judicial legerdemain would be awkward because it would require us to ignore the term "other" in section 1404(a). But these are not ideal circumstances because such manipulation creates a power that Congress considered giving federal courts but expressly rejected. See p. 1540 supra.
 
 
 107
 This, then, is not a case where Congress passed two laws at different times and forgot to harmonize them. Congress, rather, made a deliberate choice to leave trial of cases subject to the MDL process in the district where they were filed. Given section 1407(a)'s explicit command that cases be remanded for trial in the district where they were filed, and legislative history making it clear that this was a deliberate choice, I don't see how we can possibly fudge section 1404(a) to make it authorize self-transfer.
 
 
 108
 This question was not raised in Pfizer and no other federal court of appeals has ever considered it. The issue has been noted by commentators, and they have all concluded that self-transfer is not authorized by section 1404(a). See, e.g., Rhodes, 140 U.Penn.L.Rev. at 740-41 (arguing that using section 1404(a) in this way amounts to "creat[ing] a new 'venue' statute sua sponte.").
 
 
 109
 Even if we could overcome these first two hurdles, there is a third, equally daunting, one. Section 1404(a), at least as interpreted outside the MDL context, carries a strong presumption that plaintiff's choice of forum will not be disturbed. The presumption can be overcome only by a compelling showing that the convenience of parties and witnesses will be served by the transfer. See 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, § 3848, at 383. This interpretation of section 1404(a) is consistent with the traditional rule, which gave plaintiffs almost complete power to select the forum, see Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) ("[T]he plaintiff's choice of forum should rarely be disturbed."), and a judicial recognition that, by passing section 1404(a), Congress intended to disturb the plaintiff's choice of forum only for very strong reasons.[10]
 
 
 110
 In the MDL context, the traditional forum deference afforded plaintiffs disappears entirely. It's as if MDL courts are applying a mutated version of section 1404(a), one where a plaintiff's right to pick its venue has devolved to the significance of a tailbone or an appendix. Thus, MDL courts seldom even consider the rights of plaintiffs to their chosen forums, much less give this factor controlling weight. See, e.g., Transgrud, 70 Cornell L.Rev. at 809 ("When confronted with section 1404(a) motions, transferee courts have denied transfers only where those transfers would have put the parties in an improper venue or were requested prematurely."). Instead, concerns for judicial economy trump all others: "Since [a section 1404(a) transfer in the MDL context] involve[s] multiple cases, the rights, interests, and convenience of the individual parties [are] swept aside in the drive toward apparent judicial economy." Levy, 40 Fordham L.Rev. at 65; see also 15 Wright et al., § 3867, at 626 (when granting section 1404(a) transfers "notions of party and witness convenience, which typically are at the heart of transfer motions under Section 1404(a), may be subordinated to the type of judicial economy concerns that are central to Section 1407"); Richard A. Chesley & Kathleen W. Kolodgy, Mass Exposure Torts: An Efficient Solution to a Complex Problem, 54 U.Cin.L.Rev. 467, 525 (1985) ("[T]he efficiency standards of section 1407 many times overshadow the important individual concerns that the courts examine under section 1404.").
 
 
 111
 Section 1404(a), thus, has not only been conscripted by the federal courts to serve ends Congress never had in mind for it, it has also been stripped of the prudential constraints designed to protect plaintiff's choice of forum. What this means in practice is that self-transfers are not occasional, isolated events based on an unusually strong showing of judicial economy; they are the norm. The simple reality is that once a case is sucked into the MDL vortex, it seldom comes back. See In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d at 1178 (D.H. Ginsburg, J., concurring) ("In practice, the vast majority of transferred cases are so resolved, and do not return to the transferor courts."); In re New York City Municipal Secs. Litig., 572 F.2d 49, 51 (2d Cir.1978) ("[H]istory has indicated that once the limited transfer has occurred, the transferor district is not likely to see the case again.").[11]
 
 
 112
 No case better illustrates the dangers of this practice than the one now before us. Applying normal 1404(a) standards, a venue transfer of this case from Chicago to Arizona would never have been granted; the convenience of the parties and witnesses would not have been served by such a transfer, much less clearly outweighed plaintiffs' right to choose their forum. Of the four witnesses who testified at trial, two were from Chicago, none from Arizona.[12] Plaintiffs were from Chicago, defendants from California but represented by a lawyer from Chicago. The only connection between this case and Arizona was the trial judge.
 
 
 113
 Nor was the "interest of justice" clearly served by transfer to Arizona for trial. The trial lasted only five days and turned on Illinois law. See Lexecon v. Milberg Weiss, 884 F.Supp. 1388 (D.Ariz.1995) (applying Illinois law to Lexecon's defamation claim). Any advantage Judge Roll might have enjoyed in dealing with the facts was offset by the advantage a Chicago district judge would have had in instructing the jury as to Illinois law.[13]
 
 
 114
 No matter how you jiggle these factors, it's hard to come up with a plausible argument that trial in Arizona was more appropriate than trial in Chicago. Yet, as section 1404(a) is normally interpreted, a plaintiff's choice of forum can only be overcome if the transferee district is clearly more advantageous than the transferor district. Plaintiff's selection of its own home forum, when that forum is related to the subject matter of the suit, is entitled to even greater deference because both plaintiff and the community have an interest in resolving the controversy at home. See, e.g., General Foam Plastics Corp. v. Kraemer Export Corp., 806 F.Supp. 88, 89 (E.D.Va.1992); Continental Airlines, Inc. v. American Airlines, Inc., 805 F.Supp. 1392, 1395-96 (S.D.Tex.1992).[14] Instead, Lexecon was forced to trial in a forum where there was much popular feeling against Lincoln Savings, Charles Keating and those (like plaintiffs) who were associated with them.[15] It was also a forum where a respected district judge felt so strongly that plaintiffs' claim was unjustified that he found it necessary to recuse himself. See maj. op. at 1529.[16]
 
 
 115
 In ordering the self-transfer, the district court did not consider any of the traditional section 1404(a) factors. The court simply noted its familiarity with the case and concluded that it would be wasteful to have another judge conduct the trial. See Order, May 2, 1995. Such considerations of judicial economy--standing alone--have never before been sufficient to justify a section 1404(a) transfer. See, e.g., Warrick v. General Electric Co., 70 F.3d 736, 740 (2d Cir.1995) (per curiam) (judicial economy "is not alone sufficient" to justify a transfer); Wash. Pub. Util. Group, 843 F.2d at 326 ("[A] federal court may not order transfer under section 1404(a) solely for its convenience."); Codex Corp., 553 F.2d at 739 ("[W]e have found no case where [the desire for consolidation] has carried the day against factors pointing in the other direction."); Max Planck v. General Elec. Co., 858 F.Supp. 380, 382 (S.D.N.Y.1994) (noting that court expertise with the subject matter of a case is an "irrelevant" consideration under section 1404(a)). If familiarity with the case in a five-day, four-witness, one-horse trial is sufficient to justify a section 1404(a) transfer, the case simply does not exist where judicial economy will not trump a plaintiff's right to a trial in his home district.
 
 
 116
 The majority points to JPML Rule 14(b) as authority for Judge Roll's action. See maj. op. at 1533 n. 7. But the rule governs only the internal procedures of the JPML, not the authority of the district court. See J.P.M.L.R.Proc. 14(b) ("In the event that the transferee judge so transfers an action under 28 U.S.C. § 1404(a) or 1406, no further action of the Panel shall be necessary to authorize further proceedings including trial."). Nor could it, since section 1407(f) only empowers the JPML "to prescribe rules for the conduct of its business." 28 U.S.C. § 1407(f) (emphasis added).[17]
 
 
 117
 But even if Rule 14(b) somehow purported to do what the majority ascribes to it, we would still have to consider what weight to attribute to it. JPML rules are not subject to the rigorous promulgation process of the Rules Enabling Act: They are not voted upon by the Judicial Conference of the United States; they are not adopted by the Supreme Court; they are not put before Congress for possible modification or rejection. See 28 U.S.C. §§ 2072-74. Nor do they have the dignity of executive branch regulations promulgated pursuant to a substantive grant of rule-making authority. See Chevron U.S.A. v. NRDC, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). The JPML's rules have the force of local district court rules, which are authorized by a statute almost identical to section 1407(f). See 28 U.S.C. § 2071(a) ("[A]ll courts established by Act of Congress may from time to time prescribe rules for the conduct of their business."). As such, they are entitled to deference only to the extent they cover the JPML's business; they cannot broaden the transferee court's authority to act under section 1404(a). See 12 Wright et al., § 3153, at 228 ("[A] local rule is invalid if it makes 'basic procedural innovations' that should be left to the rulemaking power of the Supreme Court, surrounded, as that is, by statutory procedures that ensure mature consideration of informed opinion." quoting Miner v. Atlass, 363 U.S. 641, 650, 80 S.Ct. 1300, 1305-06, 4 L.Ed.2d 1462 (1960)); see also Jack B. Weinstein, Reform of the Federal Rule-making Process, 63 A.B.A.J. 47, 47 (1977) ("There is no real opportunity even to challenge [local] rules in litigation since the judges who will decide the case are often the ones who adopted the rules.").
 
 
 118
 The majority also takes comfort from the fact that it reaches a result that is consistent with current practice--which must be the case given how seldom cases are returned for trial in the original district once they become ensnared in the MDL web. But a practice unsupported by thoughtful analysis, one that flies in the face of three clear statutory commands, surely is entitled to little weight. Moreover, this is not a case where we can read congressional silence as signifying approval of a particular statutory interpretation, a doctrine that is "at best treacherous," Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 829-30, 90 L.Ed. 1084 (1946), and at worst "a canard." Johnson v. Transportation Agency, 480 U.S. 616, 672, 107 S.Ct. 1442, 1472-73, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting); see Patterson v. McLean Credit Union, 491 U.S. 164, 175 n. 1, 109 S.Ct. 2363, 2371 n. 1, 105 L.Ed.2d 132 (1989) (pointing out the "danger of placing undue reliance on the concept of congressional 'ratification' "). If acquiescence by silence can ever carry the day, it can do so only in areas such as the tax law where Congress exercises vigorous oversight or amends the statute frequently. Neither is the case here. Congress has amended the MDL statute only once in almost thirty years[18] and there is no indication that any of its committees exercises oversight in this area.[19] To the contrary, this is an area where Congress relies on the judiciary to point out problems and propose solutions, as it did when section 1407 was first passed.
 
 
 119
 The MDL statute, it will be recalled, was the brainchild of the federal judiciary: The Coordinating Committee for Multiple Litigation in the U.S. District Courts, established by the Judicial Conference of the United States, brought the problem to the attention of Congress, wrote the statute, lobbied for its adoption and explained to Congress exactly how it would work. See H.R. 1130, in 1968 U.S.C.C.A.N. at 1899. The Coordinating Committee eschewed the possibility of trial in the transferee court,[20] and never mentioned self-transfer as even a remote possibility.[21] Congress clearly understood the limited nature of the proposal and invited the federal judges to return if authorization for consolidated trials became necessary. See id. at 1902. The judges never bothered to return; instead, they seized the power by prescription.
 
 
 120
 * * *
 
 
 121
 Despite the complicated nature of these proceedings, the question before us is rather straight-forward: Did the district court abuse its discretion in transferring the case to itself under section 1404(a)? It clearly did because MDL courts have no authority to pass on venue transfer motions, because section 1404(a) doesn't authorize self-transfer and because the factors favoring transfer are far too weak to overcome plaintiffs' right to a trial in their home district. We must therefore vacate that order and all subsequent orders entered by the district court, including, of course, the final judgment entered after trial.[22] The case should then be in a posture where plaintiffs would finally be free to petition the MDL panel for transfer back to the Northern District of Illinois. By approving this transfer, we complete the judicial arrogation of power in this area and put the last coffin nail into the experiment Congress started in 1968 when it gave the federal courts only a limited MDL authority. I will not be one of the pallbearers. I dissent.
 
 
 
 [1]
 The firm of Greenfield & Chimicles was also a defendant initially, but is not involved in these appeals
 
 
 [2]
 The text of this order reads as follows:
 On August 12, 1992, Lexecon Inc. was dismissed from the above captioned matter. As this dismissal was without prejudice the Court retained jurisdiction and uses its powers now to clarify the terms and conditions of that dismissal. Moreover, pursuant to Fed.R.Civ.P. 60(a) the Court of its own initiative may correct any errors or omissions of the record. This Order in no way "rewrites" history, rather, it serves to clarify the terms and conditions of the Class Plaintiffs and Lexecon's agreement. This act of Court is required due to certain allegations made by Lexecon in Lexecon Inc. v. Milberg Weiss Bershad Spechrie & Learch [sic], Case No. 92 C 7768 (N.D.Ill. Nov. 25, 1992), a suit filed against Class Plaintiffs' counsel in the Northern District of Illinois.
 Specifically, in that Complaint Lexecon alleges:
 
 
 [63]
 In June 1992, after all the evidence was in, but before closing arguments, Defendants finally agreed to dismiss Lexecon, implicitly acknowledging the lack of merit in their complaint
 
 
 [64]
 At the same time, because it believed that its professional services had been misused by Lincoln and [Charles H.] Keating [Jr.], Lexecon voluntarily undertook to benefit the class by providing claims administration services (computerizing mailing lists, processing claims and the like). When Defendants' complaints to the court made it impossible for Lexecon to provide these services, Lexecon decided to benefit the class instead by voluntarily returning the professional fees paid to it by Lincoln and Keating
 
 
 [92]
 The Shields case was terminated in Lexecon's and Fischel's favor
 Lexecon Inc. v. Milberg Weiss Bershad Spechrie & Learch [sic], Complaint, p 63, p 64 and p 92.
 The Court finds these paragraphs to be a false description of the conditions under which Lexecon was dismissed from this case. Although counsel for Lexecon at hearing argued that p 93 [sic] is pled merely to satisfy one of the elements of malicious prosecution, it does not meet with reality and is factually incorrect.
 The Class Plaintiffs/Lexecon resolution was a bargained-for exchange wherein consideration flowed both ways. Lexecon agreed to perform through Touche Ross certain administrative services to the Class Plaintiffs. Subsequently, Lexecon paid approximately $900,000 in cash instead of performing the services. (footnote omitted)
 In return, Plaintiffs' counsel agreed to dismiss Lexecon from the case without prejudice and to not cross-examine the Lexecon experts about any "settlement" by Lexecon of the case. The fact that a case was filed and subsequently resolved without mention of the terms was always to be a proper subject of cross-examination. This aspect of the resolution was included because Lexecon and Mr. Fischel were concerned that if the term "settlement" was used, Lexecon experts would be open to in-depth cross-examination in courts across the country with consequent injury to its business. Hence, the term "settlement," and the connotations it might imply, was explicitly avoided and the term "resolution" used instead.
 Counsel for Lexecon has furnished the Court with a portion of a transcript from the Eastern District of Tennessee, Northern District in a case captioned, FDIC v. Ernst & Whitney, CIV 3-87-364 (E.D.Tenn. Oct. 1, 1992) as evidence of Class Plaintiffs' Counsels' bad faith breach of the resolution. A copy of this transcript is attached as Exhibit "A".
 It is the finding of this Court that Mr. Spencer cross-examined the Lexecon expert in accordance with the agreement reached with Lexecon in MDL 834 in every respect. Mr. Spencer never made any reference to the MDL 834 settlement before the jury in the Tennessee case, nor asked any questions in that case concerning a settlement in MDL 834. Indeed, Ms. Brickell on redirect, made the point that the FDIC had hired Lexecon after the Lincoln project. As long as Plaintiffs' counsels' future conduct is in accordance with Mr. Spencer's cross-examination in the Tennessee case, then the Lexecon resolution will not have been breached.
 Moreover, under no circumstances was the Class Plaintiffs/Lexecon compromise a resolution in favor of either party or, more importantly, an adjudication on the merits. Instead, it was a bargained-for resolution of a disputed matter from which both parties benefited.
 
 
 [3]
 See, e.g., In re Food Lion, Inc., Fair Labor Standards Act Litig., 73 F.3d 528, 532 n. 7 (4th Cir.1996); Washington Pub. Util. Group v. United States Dist. Ct., 843 F.2d 319, 326 (9th Cir.1987); In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1178 (D.C.Cir.1987), aff'd, 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); Kohr v. Allegheny Airlines, 504 F.2d 400, 402 (7th Cir.1974), cert. denied, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975); Pfizer, Inc. v. Lord, 447 F.2d 122, 124-25 (2d Cir.1971); Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 750 F.Supp. 330, 332 (N.D.Ill.1990); In re Air Crash Disaster, 476 F.Supp. 445, 450 (J.P.M.L.1979); In re CBS Color Tube, 342 F.Supp. 1403, 1404-05 (J.P.M.L.1972)
 
 
 [4]
 Patricia D. Howard, "A Guide to Multidistrict Litigation," 124 F.R.D. 479, 479 (1989); see also Stanley A. Weigel, "The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts," 78 F.R.D. 575, 581 n. 42 (1977); Moore's Federal Practice, Manual for Complex Litigation p 31.13 at 251 n. 785 (3d ed. 1995) ("Although transfer by the panel under § 1407 is only for pretrial purposes, the transferee court may find it appropriate to transfer cases to itself for trial under 28 U.S.C. § 1404 or § 1406.")
 
 
 [5]
 Judge Kozinski, in his dissent, decries the fact that in multidistrict litigation cases concerns for judicial economy trump the usual deference to a plaintiff's choice of forum. We fail to see the problem here. Judicial economy is extremely important in multidistrict litigation: sufficiently important that Congress enacted a special statute, 28 U.S.C. § 1407, to ensure that in multidistrict cases the interest in judicial economy would not be overridden by deference to a plaintiff's choice of forum
 
 
 [6]
 See, e.g., In re Food Lion, Inc., 73 F.3d at 532; In re Korean Air Lines, 829 F.2d at 1178; Weigel, "The Judicial Panel on Multidistrict Litigation," 78 F.R.D. at 582-83
 
 
 [7]
 The dissent contends that Judge Roll contravened the text of 28 U.S.C. §§ 1404(a) and 1407(a) by denying Lexecon's motion to return the case to the JPML and granting Milberg Weiss' motion to transfer the case permanently to the District of Arizona. In making this argument, the dissent conveniently ignores the text of JPML Rule 14(b), which clearly interprets section 1404(a) to authorize the transferee judge to transfer the case to the transferee district. The dissent also conveniently ignores the text of 28 U.S.C. § 1407(f), which explicitly grants the JPML broad authority to "prescribe rules," such as Rule 14(b), as long as those rules are "not inconsistent with Acts of Congress and the Federal Rules of Civil Procedure." 28 U.S.C. § 1407(f)
 Implicit in the dissent's argument, then, is a claim that Rule 14(b) is inconsistent with sections 1404(a) and 1407(a). The dissent is far too quick to accuse the JPML of violating the statute that created it. It is useful to recall that the JPML consists of "seven circuit and district judges designated from time to time by the Chief Justice of the United States." 28 U.S.C. § 1407(d). Respect for our brethren, and their longstanding practice, requires us to presume, absent compelling evidence to the contrary, that the rules promulgated pursuant to section 1407(f) are "not inconsistent with Acts of Congress." The alleged inconsistencies cited by the dissent are not sufficiently glaring to overcome that presumption. Hence, we conclude that Rule 14(b) is a valid exercise of the JPML's rulemaking authority, and that Judge Roll's actions in this case were fully justified.
 
 
 [8]
 The dissent argues that Lexecon should not be faulted for its failure to move the JPML for remand, because Lexecon knew that the JPML would probably have denied the motion. Even assuming that Lexecon's prospects for success were slim, the fact remains that Rule 14(c) gave Lexecon the option to present its case to the JPML, including the arguments advanced by Judge Kozinski in his dissent. Lexecon chose not to pursue that option. In making this choice, Lexecon also knew, or should have known, that the option would expire, pursuant to Rule 14(b), if and when Judge Roll decided to transfer the case permanently to the District of Arizona
 
 
 [9]
 Lexecon also argues that the denial was not an appealable interlocutory order under 28 U.S.C. § 1292(a)(1). This is irrelevant given that final judgment has since been entered. See In re Jenson, 980 F.2d 1254, 1258 (9th Cir.1992) (upon entry of final judgment, interlocutory orders become appealable). We decline to discuss Lexecon's several additional arguments concerning procedural irregularities in Milberg Weiss' appeal, which are without merit
 
 
 [10]
 See 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."); Western Sys., 958 F.2d at 871; Golden, 786 F.2d at 1427
 
 
 [11]
 Lexecon requests attorneys' fees for a frivolous appeal under Fed.R.App.P. 38. However, Rule 38, as amended effective December 1, 1994, requires that any such request be made by a separately filed motion. Without commenting on the merits of its request, we therefore deny Lexecon's request without prejudice to its filing a separate motion for attorneys' fees
 
 
 [12]
 See, e.g., In re American Continental, 845 F.Supp. at 1385 ("The record before this Court as recited in the Shields rulings is highly persuasive evidence that the case against Lexecon meets the probable cause threshold.")
 
 
 [13]
 See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); United Mine Workers of Am. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)
 
 
 [14]
 The district court did dismiss the malicious prosecution claim on this ground, concluding that Lexecon could not show that the class' claims against it in MDL 834 were objectively baseless as required by PREI. However, we may affirm the dismissal on any basis supported by the record. Pentax Corp. v. Myhra, 72 F.3d 708, 710 (9th Cir.1995)
 
 
 [15]
 There is now extensive case law on both sides of the question whether the Noerr-Pennington doctrine brings first amendment principles to bear on state law tort claims. See, e.g., State of South Dakota v. Kansas City Southern Indus., 880 F.2d 40, 50-51 (8th Cir.1989) (applying first amendment analysis to a state claim for tortious interference with contractual relations), cert. denied, 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990); Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 159-60 (3d Cir.1988) (applying defamation and Noerr-Pennington analyses to tort claim based on defendants' actions in alerting authorities to plaintiff's violations of law); Havoco of Am., Ltd. v. Hollobow, 702 F.2d 643, 649 (7th Cir.1983) (applying Noerr-Pennington and its sham litigation exception "to protect the First Amendment right to petition against claims of tortious interference with business relationships"); Sierra Club v. Butz, 349 F.Supp. 934, 938-39 (N.D.Cal.1972) (applying first amendment analyses of Noerr-Pennington and defamation cases to state counterclaim for interference with advantageous relationship); Florida Fern Growers, Inc. v. Concerned Citizens of Putnam County, 616 So.2d 562, 569 (Fla.1993) (declining to follow Sierra Club v. Butz). The time may come when this circuit must speak definitively on the question. However, this is not the right time, or the right case, in which to do so
 
 
 [16]
 Although Arizona courts define "process" broadly, Nienstedt, 651 P.2d at 880, we agree with the district court that it is not read so broadly as to include a failed attempt to sue in which process never issued
 
 
 [17]
 Examination of Lexecon's proposed second amended complaint shows that it merely reiterates the same claims in new language. Because leave to amend is inappropriate where the amendment does not solve the legal deficiencies in the complaint, the district court did not abuse its discretion in denying Lexecon's motion for leave to amend. See Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th Cir.1990)
 
 
 [1]
 It is for this reason that the majority's suggestion that Lexecon somehow waived its right to seek return of the case to the Northern District of Illinois is ill founded. See maj. op. at 1533-34. Under the Panel's rules and precedent, the JPML will not normally consider a transfer without a recommendation from the district judge. See, e.g., J.P.M.L.R.Proc. 14(d) ("The Panel is reluctant to order remand absent a suggestion of remand from the transferee district court."); In re A.H. Robins Co., 453 F.Supp. 108, 110 (J.P.M.L.1978); In re Holiday Magic Securities & Antitrust Litig., 433 F.Supp. 1125, 1126 (J.P.M.L.1977) (both noting that, absent a suggestion from the transferee court, a party seeking remand from the JPML bears a heavy burden of persuasion). Lexecon--in compliance with this authority--petitioned the district court in August 1994 to refer the case back to the JPML because all possible coordinated discovery had concluded. The district court stayed consideration of this motion pending the end of discovery. Lexecon renewed its remand request at the close of discovery in November 1994. In December 1994, defendants moved for a section 1404(a) transfer, and in March 1995, the district court granted the transfer to itself, while simultaneously denying Lexecon's remand request
 Lexecon surely cannot be faulted for following the JPML rules by petitioning the district court twice for a referral and awaiting its ruling. And, by the time the court denied the motion, it had transferred the case to itself, which made the case off limits for further action by the Panel. See J.P.M.L.R.Proc. 14(b). The majority's charge that Lexecon--which went so far as to seek a writ of mandamus from our court--"failed to seek succor" for its wrongs, maj. op. at 1534, is a sucker-punch.
 
 
 [2]
 See maj. op. at 1532 & n. 3 (citing In re Food Lion, Inc., Fair Labor Standards Act Litig., 73 F.3d 528, 532 n. 7 (4th Cir.1996); Washington Pub. Util. Group v. United States Dist. Ct., 843 F.2d 319, 326 (9th Cir.1987); In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1178 (D.C.Cir.1987), aff'd, 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); Kohr v. Allegheny Airlines, 504 F.2d 400, 402 (7th Cir.1974), cert. denied, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975); In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 750 F.Supp. 330, 332 (N.D.Ill.1990); In re Air Crash Disaster Near Chicago, 476 F.Supp. 445, 450 (J.P.M.L.1979); In re CBS Color Tube, 342 F.Supp. at 1404-05)
 
 
 [3]
 See, e.g., Washington Pub. Util. Group, 843 F.2d at 326; In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d at 1178 n. 7; In re Fine Paper Antitrust Litigation, 685 F.2d at 820 n. 7; Eastern Air Lines, Inc. (In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972), 549 F.2d at 1009 n. 4; In re Air Crash Disaster at Detroit Met. Airport on Aug. 16, 1987, 737 F.Supp. 391, 394 n. 4 (E.D.Mich.1989); In re Tax Refund Litig., 723 F.Supp. 922, 924 (E.D.N.Y.1989); In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987, 720 F.Supp. 1455, 1458 (D.Colo.1988); In re Dow Co. "Sarabond Products" Liab. Litig., 664 F.Supp. 1403, 1403-04 (D.Colo.1987); In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975, 479 F.Supp. 1118, 1122-23 (E.D.N.Y.1978); In re Air Crash Disaster Near Chicago, 476 F.Supp. at 450; In re Anthracite Coal Antitrust Litig., 436 F.Supp. 402, 403-04 (J.P.M.L.1977); In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig., 424 F.Supp. 504, 507 (J.P.M.L.1976); In re Bomb Disaster at Roseville, Cal., on April 28, 1973, 399 F.Supp. 1400, 1403 (J.P.M.L.1975); In re Caesars Palace Securities Litig., 360 F.Supp. 366, 374 (S.D.N.Y.1973); In re Aircrash Near Duarte, Cal., on June 6, 1971, 357 F.Supp. 1013, 1015 (C.D.Cal.1973); In re CBS Color Tube Patent Litig., 342 F.Supp. at 1405 n. 2; In re Air Crash Disaster at Huntington, W. Va., on Nov. 14, 1970, 342 F.Supp. 1400, 1403 n. 4 (J.P.M.L.1972); Greyhound Computer Corp. v. I.B.M. Corp., 342 F.Supp. 1143, 1145 (D.Minn.1972); In re Viatron Computer Systems Corp. Litig., 86 F.R.D. 431, 432-33 (D.Mass.1980); In re Master Key Antitrust Litig., 70 F.R.D. 23, 28 (D.Conn.1975); In re Penn Central Commercial Paper Litig., 62 F.R.D. 341, 345 (S.D.N.Y.1974), aff'd, 515 F.2d 505 (2d Cir.1975) (all relying on Pfizer)
 
 
 [4]
 In re Korean Air Lines Disaster of Sept. 1, 1983 dealt with whether the Van Dusen rule--that the state law applicable in the transferor forum attends the transfer--should apply to transferred federal claims. See 829 F.2d at 1174. Although Judge Douglas Ginsburg in his concurrence does mention the self-transfer practice, see id. at 1178 (D.H. Ginsburg, J., concurring), Judge Ruth Bader Ginsburg writing for the court describes section 1407(a) as "a statute authorizing transfers only for pretrial purposes." Id. at 1174. The Fourth Circuit also made passing reference to this practice in a footnote, see In re Food Lion, Inc., Fair Labor Standards Act Litig., 73 F.3d at 532 n. 7, on its way to addressing the issue in that case--when parties may appeal dispositions in the transferee court. Significantly, the Fourth Circuit noted, "Although Congress has not yet seen fit to allow the Panel or the transferee court to consolidate cases for trial, this is possibly a next step." Id. at 532. Our circuit and the Fifth have also noted the practice, but declined to address its legitimacy because the parties hadn't raised the issue. See Washington Pub. Util. Group v. United States Dist. Ct., 843 F.2d 319 at 326 (the parties "disagree only as to whether the court properly applied [section 1404(a) ]"); Gordon v. Eastern Air Lines, Inc. (In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972), 549 F.2d at 1009 n. 4 ("The parties have not raised the question whether [a court can transfer an MDL case to itself;] therefore we do not reach it."). The Seventh Circuit has twice reported that the practice exists when recapping the factual history of cases that dealt with issues unrelated to the self-transfer question. See Eckstein v. Balcor Film Investors, 8 F.3d 1121 (7th Cir.1993), cert. denied, 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994); Kohr, 504 F.2d at 402
 Only the Third Circuit has seemingly blessed this practice. See In re Fine Paper Antitrust Litigation, 685 F.2d at 810. But the Third Circuit, in the single paragraph it devotes to the subject, doesn't even mention the possible conflict with section 1407(a), effectively assuming that self-transfer in the MDL context is appropriate. See id. at 819-20. Moreover, the Third Circuit's analysis consists primarily of a block quote from, you guessed it, Pfizer. See id. at 820 n. 7.
 
 
 [5]
 As I note below, shoehorning venue transfers into the concept of "coordinated or consolidated pretrial proceedings" requires a dramatic recalibration of the section 1404(a) calculus. See pp. 1546-49 infra. That MDL courts are unable to achieve consolidation for trial without twisting the standards of section 1404(a) beyond recognition ought to be a further clue that MDL courts have no business passing on venue transfer motions
 
 
 [6]
 This was certainly the case here, as Judge Roll postponed deciding Lexecon's first change of venue motion (its initial remand request) until the end of discovery, at which time Milberg Weiss made its motion seeking self-transfer. Once discovery is completed, however, consolidated proceedings have ceased and there is no justification for allowing the transferee court to rule on the venue transfer motion; the motion could, just as easily, be ruled on by the originating district court after the case is remanded by the JPML
 Habitual procrastination of venue transfer decisions by MDL courts is ironic considering Pfizer's big worry that, if the transferee court does not have authority to rule on a change of venue motion, no court would be able to do so during the course of pretrial proceedings. See Pfizer, 447 F.2d at 125 ("[T]o hold that the transferee court ... has no section 1404(a) authority would mean that all proceedings on any section 1404(a) motion would have to be suspended for the entire period of pretrial...."). This concern was especially misplaced because, so long as the case is partaking of "coordinated or consolidated pretrial proceedings" there is no need to transfer venue; indeed, any such transfer would defeat the purpose for which the case was consolidated in the first place.
 
 
 [7]
 What kind of dispositive motions the MDL transferee court may rule on was once a subject of great controversy, but transferee courts, with the JPML's approval, now largely assume unlimited authority. See Levy, 40 Fordham L.Rev. at 60-61; see also Comment, The Experience of Transferee Courts, 39 U.Chi.L.Rev. at 588-89 ("After an initial period of hesitancy, transferee courts have steadily increased their control over pretrial proceedings far beyond the role envisioned by the drafters of the statute."). In fact, there is good reason to believe that Congress did not intend transferee courts to wield such unlimited authority. Had Congress wanted to authorize consolidated summary judgment procedures, it would have authorized the JPML to consolidate cases that presented common legal questions. Instead, Congress authorized consolidation only of cases that present "common questions of fact." Naturally, the JPML quickly ignored this limitation as well, and now routinely transfers cases where only common questions of law are at issue. See, e.g., Levy, 40 Fordham L.Rev. at 48
 Whatever the scope of the MDL court's power to issue dispositive pretrial orders, the duration of that power cannot extend beyond the time when "coordinated or consolidated pretrial proceedings" come to an end. At that point, there's no further justification for keeping the case in the MDL process and hence no authority for the MDL transferee court to enter further orders.
 
 
 [8]
 The majority takes comfort from passages of legislative history that in fact support my view. See maj. op. at 1532-33. The first passage quoted by the majority clearly says that venue transfer under section 1407(a) is for the "limited purpose of conducting coordinated pretrial proceedings" and that "[i]t would not affect the place of trial in any case." H.Rep. No. 1130, in 1968 U.S.C.C.A.N. at 1900. Presumably, the majority relies on the portion of the quote which states that section 1407(a) would not "exclude the possibility of transfer under other Federal statutes." Id. I don't see how this helps the majority a bit. The passage merely affirms that, while the MDL statute would provide a special mechanism for transferring cases for pretrial purposes, all other venue transfer provisions remain in effect once the MDL procedure ends and the case is remanded. It surely couldn't have meant that transferee courts have the power to keep cases for trial when the rest of the quote says just the contrary
 The majority's second block quote is no more helpful. Presumably, again, the majority intends to emphasize the portion of the quote which allows, "Of course, 28 U.S.C. § 1404, providing for changes of venue generally, is available in those instances where transfer of a case for all purposes is desirable." Id. at 1902. But the majority omits, by way of an ellipsis, the two sentences preceding this quote, which help put it in perspective:
 Additionally, trial in the originating district is generally preferable from the standpoint of the parties and witnesses, and from the standpoint of the courts it may be impracticable to have all cases in mass litigation tried in one district. Additionally, the committee recognizes that in most cases there will be a need for local discovery proceedings to supplement coordinated discovery proceedings, and that consequently remand to the originating district for this purpose will be desirable.
 Id. Nor does the majority quote the sentence that immediately succeeds its quote: "If proposed section 1407 should be enacted and future experience justifies extending it to include consolidation and coordination for trial purposes as well, only minor amendments to the present language of the bill will be necessary." Id. Sandwiched between these provisions, which make it clear that Congress was not intending to authorize MDL transferee courts to keep the cases sent to them for coordinated discovery, the sentence referring to section 1404 could only have been intended as another acknowledgment that the new MDL statute would not preclude normal venue transfers by the court where the case was originally filed.
 In any event, vague allusions in the committee reports cannot override the clear statutory language of section 1407, which effectively forecloses venue transfers during the pendency of MDL procedures. This is precisely what one commentator who analyzed section 1407 before its enactment concluded: "[C]learly the [Coordinating C]ommittee's language [which was adopted into the House and Senate reports] is too ambiguous to provide any substantial justification for a court's reading section 1407 in a way opposed to its literal prohibition of transfers." Comment, Consolidation of Pretrial Proceedings Under Proposed Section 1407 of the Judicial Code: Unanswered Questions of Transfer and Review, 33 U.Chi.L.Rev. 558, 562 (1966). This commentator seems to have underestimated the creativity of federal judges.
 
 
 [9]
 Defendants make a Rube Goldberg argument that Lexecon's case was, in fact, transferred to another district: Although transferred temporarily for pretrial purposes, the case was still technically pending in the Northern District of Illinois when the section 1404(a) transfer moved it to the District of Arizona, an "other district ... where it might have been brought." See Br. of Milberg Defendants and of Cross-Appellant Milberg Weiss, at 25. Defendants seem to think that section 1404(a) merely requires that a case be transferred from one court to another
 This argument makes no linguistic sense because section 1404(a) provides that "a district court may transfer any civil action to any other district...." 28 U.S.C. § 1404(a) (emphasis added). The phrase "any other district," which specifies the receiving court, stands in contrast to the earlier phrase "a district court," which refers to the court making the transfer. Or, to put it differently, the term "other district" must relate back to the term "district" within the same sentence. Thus, the court making the transfer cannot, under the terms of section 1404(a), be the same as the court receiving the transfer.
 
 
 [10]
 The Supreme Court in Norwood v. Kirkpatrick, 349 U.S. 29, 75 S.Ct. 544, 99 L.Ed. 789 (1955), upheld a section 1404(a) transfer away from a plaintiff's home forum, which would have been impermissible under the traditional forum non conveniens doctrine. The Court reasoned that section 1404(a) was intended to broaden the power of courts to order venue transfers. "[N]evertheless it has been consistently held since that decision that plaintiff's choice of a forum will not be disturbed unless the balance of convenience weighs heavily in favor of defendant." Franklin v. Blaylock, 218 F.Supp. 261, 262 (S.D.N.Y.1963), aff'd sub nom. Blaylock v. McLean, 319 F.2d 533 (2d Cir.1963) (citations omitted); see also Stephen C. Yeazell et al., Civil Procedure 193 (3d ed. 1992)
 
 
 [11]
 I've found no case where an MDL court has been reversed for transferring a case to itself for trial
 
 
 [12]
 Of the 42 witnesses whose depositions had been noticed or taken at the time the request for remand was filed by Lexecon, only one was from Arizona. See Plaintiffs' Motion to Remand at 9. A very fine witness, to be sure, but still only one
 
 
 [13]
 This was not even a situation where the parties and witnesses were already going to trial on related claims so it would have been convenient to try this case at the same time. Cf. In re Fine Paper, 685 F.2d at 820 ("[P]laintiffs' convenience was outweighed by the comparative economy of trying one case in the Eastern District rather than several actions in the [plaintiffs'] home districts."). All other cases involving Lincoln Savings had long since been resolved
 
 
 [14]
 The rationale behind this rule is brought home by considering whether a Chicago or Arizona jury would better appreciate the following attempt by Lexecon's counsel to evoke sympathy for his client during summation:
 And as a kid, I used to go into Chicago and see these great skyscrapers, and through them you would see Lake Michigan glimmering in the distance. And about this time of the year, the pavement would shimmer with heat. About right now in Chicago, people in Lexecon are getting out of work and they are going to their cars and going to the subway, and they are thinking maybe about what is happening out here, and wondering: Will Lexecon continue to be the kind of fine organization that Dan Fischel built it to be? Will they have a future?
 RT at 234-35 (July 31, 1995).
 
 
 [15]
 Not surprisingly, defense counsel peppered his arguments with references to Charles Keating's misdeeds and defendants' attempts to recover money for the victims, whom counsel described as "those retired people, the 23,000 people who got robbed, raped and peltered [sic] by Charles Keating." RT at 187 (July 31, 1991). Defense counsel also made much of the fact that, by settling the Lincoln Savings case, Lexecon avoided the verdict of an Arizona jury, and then ran off to Chicago and filed suit. See id. at 215 ("Now, as I said [before], if Lexecon wanted vindication, it could have taken its case to the jury. It did not. It paid $700,000. That is fine. But then it shouldn't have gone back to Chicago and thrown that $15 million brick at [defendants by filing suit]. It shouldn't have done that.")
 
 
 [16]
 As the majority notes, Judge Bilby went so far as to amend the record in the earlier proceeding by entering an order explicating his view of the settlement and deriding Lexecon for having brought this lawsuit. Judge Bilby no doubt was sincere in his views but his order amounted to little more than testimony about his perception of the settlement. As this statement was not subject to the normal safeguards applicable to witnesses--such as cross-examination and impeachment--I find it troubling that the majority relies on it in characterizing Lexecon's case. See maj. op. at 1529-30
 Although Judge Roll had nothing to do with this order, he may have been influenced by his colleague's strong feelings, and thus "we [might] consider prior judicial experience in such a situation more a negative than an affirmative reason for transfer." Codex Corp. v. Milgo Electronic Corp., 553 F.2d 735, 739 (1st Cir.), cert. denied, 434 U.S. 860, 98 S.Ct. 185, 54 L.Ed.2d 133 (1977). Moreover, defense counsel repeatedly referred to the sentence from Judge Bilby's order characterizing Lexecon's complaint as "a false description of the conditions under which [it] was dismissed from [the Lincoln Savings ] case." Defense counsel made sure the jury understood just who Judge Bilby was: "Judge Bilby learned of this lawsuit and Judge Bilby entered an order. The judge sitting across the street, the former Chief Judge of this district." RT at 193 (July 31, 1995).
 
 
 [17]
 The JPML itself takes the position that it has no authority to tell MDL transferee courts what actions to take in the cases entrusted to them, including whether to grant section 1404(a) venue transfers. See, e.g., In re Air Crash Disaster Near Chicago, 476 F.Supp. at 450 ("[T]he Panel has neither the authority nor the desire to control decisions of the transferee judge made in the actual conduct of coordinated or consolidated pretrial proceedings[, including section 1404(a) determinations]."); In re Westinghouse Electric Corp. Uranium Contract Litig., 436 F.Supp. 990, 996 (J.P.M.L.1977) ("The Panel has neither the power nor the inclination to dictate in any way the manner in which judges process actions pending before them.")
 
 
 [18]
 In 1976, Congress added section 1407(h) to provide for consolidation of cases filed under a newly added section 4C of the Clayton Act. See Pub.L. No. 94-435, tit. III, § 303, 1976 U.S.C.C.A.N. (90 Stat.) 1383, 1396
 
 
 [19]
 Congressional silence in the face of the self-transfer practice is especially problematic considering how inconspicuous the practice is. First, there are no accurate statistics on how many cases are subjected to self-transfer; neither the JPML nor the Administrative Office of the United States Courts nor the Federal Judicial Center keeps track. All we know is that lots of cases are subjected to the MDL process and very few ever get remanded. Second, the MDL statute continues to be portrayed as a mechanism affecting only pretrial, not trial, making "MDL appear to do less than it does." Judith Resnik, From "Cases" to "Litigation", 54 Law & Contemp. Probs. 5, 47 (Summer 1991)
 
 
 [20]
 The Committee stated that "[t]he major innovation proposed is transfer solely for pre-trial purposes," which would achieve efficiency "without losing the benefits of local trials." Report of the Co-Ordinating Committee on Multiple Litigation Recommending New Section 1407, Title 28 (Mar. 2, 1965), reprinted in In re Plumbing Fixture Cases, 298 F.Supp. 484, 498, 499 (J.P.M.L.1968). As a result of the increased efficiency during pretrial, the Committee claimed that section 1407 would actually "maximize the litigant's traditional privileges of selecting where, when and how to enforce his substantive rights or assert his defenses." Id. (emphasis added)
 
 
 [21]
 The Coordinating Committee explained that section 1407 "would not affect the place of trial in any case or exclude transfer under other statutes (e.g., Title 28, U.S.C. §§ 1404(a) and 1406(a)) prior to or at the conclusion of pre-trial proceedings." Report of the Co-Ordinating Committee on Multiple Litigation Recommending New Section 1407, Title 28 (Mar. 2, 1965), 298 F.Supp. at 499. By using the phrase "prior to or at the conclusion of pre-trial proceedings," the Committee clearly indicated that a venue transfer would only be available before or after, but not while, the case was in the MDL court. See Comment, Consolidation of Pretrial Proceedings, 33 U.Chi.L.Rev. at 562
 
 
 [22]
 In point of fact, at the time Lexecon made its first request for remand on August 5, 1994, all coordinated and/or consolidated pretrial proceedings--to the extent there ever were any--had come to an end. All orders entered by the district court after that date were beyond its authority as they did not relate to the limited purpose for which the case was transferred under section 1407(a). See note 7 supra. These orders, particularly the summary judgment granted on April 24, 1995, should be vacated